IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

MAURICE JEWELL, JR.,
on behalf of himself and all others similarly situated,

                Plaintiff,                OPINION and ORDER

   v.

                                            19-cv-247-jdp

HSN, INC.,

                Defendant.

---

Plaintiff Maurice Jewell brings this proposed class action against defendant retailer HSN, Inc. Jewell used an HSN-branded credit card issued by Comenity Capital Bank to make purchases from HSN, which attempted to collect his unpaid balance. Jewell contends that HSN refused to comply with his requests to stop calling his mobile phone in its collection attempts, thereby violating the Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227, and the Wisconsin Consumer Act (WCA), Wis. Stat. §§ 427.101–105.

HSN moves to compel arbitration, relying on an arbitration provision in the account agreement between Jewell and Comenity.[1] Dkt. 11. Because HSN isn't entitled to compel arbitration under the account agreement, the court will deny HSN's motion.

BACKGROUND

A motion to compel arbitration is reviewed in the same way as a motion for summary judgment. *Tinder v. Pinkerton Sec.*, 305 F.3d 728, 735 (7th Cir. 2002). The court considers all

---

[1] In a footnote in its brief, HSN says that Jewell has named the incorrect defendant because the acts alleged would have been committed by HSNi, LLC, HSN's operational subsidiary. But that point is not germane to the arbitration issue, so the court won't address it in this opinion.

evidence in the record and draws all reasonable inferences in the light most favorable to Jewell because he is the non-moving party. *Id.*

Comenity (which isn't a party to this lawsuit) partners with nearly 150 retailers, including HSN, to issue branded credit cards. Together, Comenity and HSN market the HSN Card, a credit card that can only be used to purchase goods from HSN. The HSN Card's account agreement is solely between the cardholder and Comenity; HSN isn't a party to the agreement.

HSN also offers some of its goods through its "FlexPay" program, which allows a customer to receive his purchase up front and then pay for it in installments. Dkt. 14, ¶ 12. When due, each installment is billed separately to the customer's credit card, whether it is an HSN Card or another card.

In 2016, Jewell used his HSN Card to purchase two items from HSN, a t-shirt and a smartphone, under the FlexPay program. Each item's price was divided into five installments, which HSN billed to Jewell's HSN Card. The first four installments for each item were billed successfully, but Comenity declined payment for both items' fifth installments. HSN then called Jewell's mobile phone regarding these declined payments. Those calls form the basis of this lawsuit.

The HSN Card account agreement contains an arbitration provision that states, "Arbitration may be elected by any party with respect to any Claim." Dkt. 13-1, at 3. It defines a "Claim" as "any claim, dispute, or controversy between you and us" that relates to the cardholder's use of the card. *Id.* And it defines "Parties Subject to Arbitration," in relevant part, in this way: "Solely as used in this Arbitration Provision (and not elsewhere in this Agreement), the terms 'we,' 'us' and 'our' mean . . . Comenity Capital Bank, any parent, subsidiary or

affiliate of the Bank and the employees, officers and directors of such companies." *Id.* HSN moves to compel arbitration under these provisions of the account agreement.

ANALYSIS

HSN isn't a party to Jewell's account agreement with Comenity, which would normally prevent HSN from invoking the agreement's arbitration provision. *Everett v. Paul Davis Restoration, Inc.*, 771 F.3d 380, 383 (7th Cir. 2014). But a nonparty can sometimes invoke an arbitration provision under principles of state contract law. *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009). Because the account agreement states that it is governed by Utah law, the parties agree that Utah law should govern application of the agreement's arbitration provision.

HSN contends that under Utah law, it is entitled to invoke the agreement's arbitration provision as a third-party beneficiary of the agreement or under equitable estoppel principles and that Jewell's claims fall within the provision's scope. But the court isn't persuaded by either of these theories.

A. **Third-party beneficiary**

HSN's primary contention is that it is expressly included in the account agreement's arbitration provision as an "affiliate" of Comenity entitled to compel arbitration. This is really an argument that HSN is a third-party beneficiary under the express terms of the agreement, although HSN doesn't frame it in this way. HSN argues, alternatively, that it's a third-party beneficiary of the agreement because the agreement provided credit enabling Jewell to purchase goods from HSN.

1. **Entities included in the arbitration provision**

Under Utah law, a third party can enforce a contract as a third-party beneficiary "only if the parties to the contract clearly express an intention 'to confer a separate and distinct benefit' on the third party." *Bybee v. Abdulla*, 189 P.3d 40, 49 (Utah 2008) (quoting *Rio Algom Corp. v. Jimco, Ltd.*, 618 P.2d 497, 506 (Utah 1980)). The account agreement between Jewell and Comenity states that entities entitled to compel arbitration include "any parent, subsidiary or affiliate" of Comenity Dkt. 13-1, at 3. HSN says it qualifies as an "affiliate" under this clause, giving it the right to compel Jewell to arbitrate his claims.

The term "affiliate" isn't defined within the arbitration provision, so HSN says that the term should be given the meaning an unsophisticated consumer would give it.[2] HSN points to several dictionary definitions of "affiliate" to illustrate how such a consumer would interpret the term. But HSN doesn't meet all the definitions it cites. For example, HSN cites the American Heritage Dictionary, which defines "affiliate" to mean "[a] person, organization, or establishment associated with another as a subordinate, subsidiary, or member."[3] HSN doesn't contend that it's a subordinate, subsidiary, or member of Comenity. Merriam-Webster provides a broader definition of "affiliate," defining the word's verb form as "to connect or associate oneself" and its noun form as "an affiliate person or organization."[4] But at most, the

---

[2] The case HSN cites for the "unsophisticated consumer" standard applies only to the interpretation of insurance contracts. *See Fire Ins. Exch. v. Oltmanns*, 416 P.3d 1148, 1156 (Utah 2018). But Jewell doesn't challenge HSN's use of this standard, and it doesn't affect the court's analysis of the meaning of "affiliate."

[3] *Affiliate*, The American Heritage Dictionary of the English Language (5th ed. 2019), https://ahdictionary.com/word/search.html?q=affiliate.

[4] *Affiliate*, Merriam-Webster, https://www.merriam-webster.com/dictionary/affiliate (last visited Oct. 22, 2019).

definitions HSN provides only show that the term has a wide range of potential definitions, ranging from mere connection or association to a close relationship based on shared ownership or control. These dictionary definitions don't resolve the question of how "affiliate" is used in the arbitration provision.

The dictionary definitions provided by HSN serve only as a starting point for the term's interpretation, providing "a range of possible meanings" for the term, *Hi-Country Prop. Rights Grp. v. Emmer*, 304 P.3d 851, 856 (Utah 2013). The court may then turn to the term's context to determine the term's meaning from within this range of possible definitions. *Id.* The account agreement contains a privacy statement, which discusses how Comenity uses cardholders' personal information. The privacy statement defines "affiliates" as "[c]ompanies related by common ownership or control." Dkt. 13-1, at 3. Under the canon of consistent usage, courts presume that a word used with a clear meaning in one part of a document is intended to have the same meaning when used ambiguously in another part of the same document. *Utley v. Mill Man Steel, Inc.*, 357 P.3d 992, 1008 (Utah 2015).

The arbitration provision provides textual support for a consistent definition of "affiliate" throughout the agreement. The arbitration provision says that any "parent, subsidiary or affiliate" of Comenity can compel arbitration. *Id.* at 3. Utah courts construe ambiguous contract terms in light of the surrounding language. *See W.S. Hatch Co. v. Pub. Serv. Comm'n*, 277 P.2d 809, 812 (Utah 1954) ("Under the rule of *noscitur a sociis*, when there is uncertainty about intent, the meaning of doubtful words or phrases is to be determined in the light of associated words and phrases."). Here, "affiliate" is immediately preceded by "parent" and "subsidiary," terms that, like the privacy statement's definition of "affiliate," involve a

5

relationship based on ownership or control. This strongly suggests that, as used in the arbitration provision, the term "affiliate" requires shared ownership or control.

But HSN says that the privacy statement uses a different meaning of "affiliate" than the arbitration provision for two reasons. First, it argues that because the arbitration provision says its definition of the terms "we," "us," and "our" is limited to that provision alone, that should preclude importing the privacy statement's definition of "affiliate" into the arbitration provision. But that argument is not supported by the text of the arbitration provision. The arbitration provision expressly restricts only the definitions of those three words—"we," "us," and "our"—not the words used to define them, such as "affiliate." So this restriction says nothing about whether the agreement's drafters intended the privacy statement and arbitration provisions to use "affiliate" in different ways. Second, HSN points to formatting differences between the privacy statement and the rest of the account agreement. The privacy statement is printed horizontally along the bottom of both pages of the agreement, set off by a set of asterisks on each page. This, HSN says, shows that the privacy statement's definition of "affiliate" is separate from the remainder of the document. But the privacy statement is unquestionably part of the account agreement. It's explicitly mentioned in the list of the agreement's sections, Dkt. 13-1, at 2, and it's printed on the same two pages as the rest of the agreement. So this formatting variation doesn't show that the agreement's drafters intended for "affiliate" to have different meanings in the privacy statement and in the rest of the agreement.

HSN contends that Jewell himself understood HSN to be a Comenity affiliate, pointing to an allegation in Jewell's complaint that he made purchases "pursuant to an open-end credit plan with Defendant." Dkt. 1, ¶ 15. This, HSN argues, should be treated as an admission by

6

Jewell "that HSN is connected or associated" with the HSN Card and the account agreement. Dkt. 16, at 7. HSN is, in some way, connected with the HSN Card and the account agreement. But this general connection does not bring HSN within the scope of the arbitration provision's definition of "affiliates."

Finally, HSN contends that even if the privacy statement's definition of "affiliate" applies within the arbitration provision, HSN satisfies that definition. HSN offers two arguments to support this contention. First, HSN argues that (1) the privacy statement says that Comenity will share "information about [the cardholder's] transactions and experiences" with affiliates, Dkt. 13-1, at 2; (2) Comenity shares such information with HSN; and so (3) HSN must be an affiliate of Comenity. But HSN's conclusion doesn't follow from its premises. The language HSN cites isn't a definition of "affiliates"; it's simply a statement of one thing Comenity does with its affiliates. In other words, Comenity shares this information with all affiliates, but it doesn't follow that all those with whom Comenity shares this information must be affiliates. Second, HSN says that it and Comenity are affiliates under the privacy statement's definition because of their common "control." But the only evidence of common control that HSN identifies is that the companies share information, maintain a joint marketing fund, and "regularly hold meetings and otherwise work together to market the HSN Card." Dkt. 16, at 12. This isn't evidence of common control; it shows at most a joint venture between Comenity and HSN.

In sum, none of HSN's arguments establish that HSN is a third-party beneficiary of the arbitration provision because it is an affiliate of Comenity. The arbitration provision uses the term to mean an entity related to Comenity by shared ownership or control, and HSN doesn't share ownership or control with Comenity.

### 2. Benefits HSN receives from the account agreement

HSN also argues that it's a third-party beneficiary of the account agreement because the agreement gave Jewell credit to purchase goods from HSN. This shows that HSN received *some* benefit from the agreement, but that doesn't automatically make HSN a third-party beneficiary. To establish its status as a third-party beneficiary, HSN must show that the parties to the agreement—Jewell and Comenity—clearly intended to confer a benefit on HSN that is "separate and distinct" from the agreement's benefits to the parties. *Rio Algom*, 618 P.2d at 506. If the benefits conferred on HSN by the agreement are only incidental to the benefits conferred on the parties, HSN has no right to enforce the agreement. *Id.*

*Palmer v. Davis*, 808 P.2d 128 (Utah App. 1991) provides an example of such a "separate and distinct" benefit. In *Palmer*, the plaintiff's minor son was injured at work. *Id.* at 129. The defendant, Davis, was a coworker of her son. *Id.* Before suing Davis, the plaintiff had signed a settlement agreement with her son's and Davis's employer expressly releasing the employer's "agents, servants, [and] employees" from liability. *Id.* The plaintiff then sued Davis for his role in the accident. *Id.* The court held that Davis was entitled to enforce the release as a third-party beneficiary because the contract's language clearly indicated that employees such as Davis were intended beneficiaries by explicitly and unambiguously naming them as such. *Id.* at 131.

In contrast, *SME Industries, Inc. v. Thompson, Ventulett, Stainback & Associates., Inc.*, 28 P.3d 669 (Utah 2001) illustrates the type of incidental benefits that aren't enough to confer third-party beneficiary status. In that case, a Utah county had contracted with an architectural consulting firm to commission design documents for a construction project. *Id.* at 672. The consulting firm then entered into contracts relating to the project with two subcontractors. *Id.* After construction began on the project, the plaintiff, a construction firm, obtained the county's

rights against the consulting firm and its subcontractors through settlement of a separate legal action involving the county. *Id.* at 673. The plaintiff construction firm then sued the defendant consulting firm, asserting the county's rights as a third-party beneficiary under the defendant's contracts with its subcontractors. *Id.* at 684. But the court held that the contracts showed no intention by the parties to confer a benefit on the county that was separate and distinct from the benefits the contracts conferred on the parties. *Id.* at 685. The benefit the county received (the use of the design documents created as a result of the contracts) only incidentally resulted from the benefits those contracts conferred upon the defendant (the work of the subcontractors in creating the documents). *Id.*

Following the principles in these cases, HSN is only an incidental beneficiary of the account agreement between Comenity and Jewell, not a third-party beneficiary. The benefit the defendant received in *Palmer* was a "separate and distinct" benefit because it didn't occur as a direct result of the contract's benefits to the parties. Instead, the parties had to specifically negotiate for that benefit—the release of the employees. Unlike *Palmer*, the benefit the account agreement conferred on HSN (the sales it facilitated to Jewell) directly resulted from the benefits the agreement conferred on the parties (the credit Comenity extended to Jewell to make HSN purchases). This is much more like the incidental benefit received by the county in *SME Industries*—the use of design documents created under contracts between the defendant and its subcontractors. The benefit HSN received from the account agreement isn't separate and distinct from the parties' benefits, and it does not make HSN a third-party beneficiary of the agreement.

## B. Equitable estoppel

HSN contends that Jewell should be equitably estopped from avoiding arbitration. Utah, like other jurisdictions, recognizes the doctrine of equitable estoppel, which requires a showing of three elements: (1) one party took a prior action or inaction that is inconsistent with a claim it asserted later; (2) the second party took a reasonable action or inaction based on the first party's action or inaction; and (3) the second party would be injured by allowing the first party to act inconsistently. *Nunley v. Westates Casing Servs., Inc.*, 989 P.2d 1077, 1088 (Utah 1999).

HSN says that this doctrine should apply because (1) Jewell purchased goods from HSN with a promise to pay for them using the HSN Card; (2) HSN gave Jewell these goods in reliance on his promise; and (3) HSN's calls to Jewell were made to collect on Jewell's promise to pay. HSN says that this promise should estop Jewell from avoiding arbitration of his claims against HSN because those claims are intertwined with his account agreement, which contains an arbitration provision. The fundamental problem with HSN's argument is that it would show only that Jewell would be estopped from avoiding payment for the goods he ordered, which isn't at issue in this lawsuit. HSN doesn't show that allowing Jewell to avoid arbitration of his claims against HSN would be inconsistent with Jewell's promise to arbitrate claims against Comenity. Jewell's claim—that HSN violated its obligations under federal and state law relating to unsolicited telephone calls—has nothing to do with any claims against Comenity.

Utah courts have not addressed whether a nonsignatory to an arbitration agreement (like HSN here) can use the doctrine of equitable estoppel to compel arbitration with a signatory to the agreement (like Jewell here). In *Ellsworth v. American Arbitration Ass'n*, 148 P.3d 983 (Utah 2006), the court considered the reverse situation—a signatory trying to compel a

nonsignatory to arbitrate—and held that estoppel did not apply because the nonsignatory was "not attempting to sue . . . on the contract" and had "not received any direct benefit from the contract." *Id.* at 989. And in *Solid Q Holdings LLC v. Arenal Energy Corp.*, 362 P.3d 295, 298 (Utah App. 2015), the court also considered whether a nonsignatory (in that case, the plaintiff) should be estopped from avoiding arbitration. As in *Ellsworth*, the court concluded that estoppel didn't apply because the plaintiff hadn't sued on the contract or obtained a direct benefit from it. *Id.* at 298. The court also considered the defendant's contention, resting on case law outside Utah, that estoppel should apply because the plaintiff's claims were "intertwined" with the contract. *Id.* The court rejected that contention, observing that other courts had applied that form of estoppel only to signatories. *Id.* at 298–99.

Jewell's claims against HSN don't depend on the account agreement in any way. He contends that HSN violated state and federal statutes by calling his cell phone without his consent, claims that he could have raised regardless of whether he had an account agreement with Comenity. Although Utah law doesn't appear to have addressed this type of estoppel, other jurisdictions have required much closer ties than these between a party's claims and a contract containing an arbitration agreement before estopping the party from avoiding arbitration. *See, e.g.*, *White v. Sunoco, Inc.*, 870 F.3d 257, 263 (3d Cir. 2017) ("[A] plaintiff-signatory cannot have his cake (use the agreement against the non-signatory) and eat it too (avoid enforcement of the arbitration clause within the agreement."); *Bridas S.A.P.I.C. v. Gov't of Turkm.*, 345 F.3d 347, 361–62 (5th Cir. 2003) (noting that estoppel is appropriate in cases where "the parties resisting arbitration had expressly agreed to arbitrate claims of the very type that they asserted against the nonsignatory" and refusing to estop plaintiff who didn't sue "under the agreement" containing an arbitration provision); *MS Dealer Serv. Corp. v. Franklin*,

11

177 F.3d 942, 947–48 (11th Cir. 1999) (estopping signatory plaintiff because each claim "makes reference to and presumes the existence of" a charge contained in a contract with an arbitration agreement), *abrogated on other grounds by Arthur Andersen*, 556 U.S. at 631.

In other words, "[f]or a plaintiff's claims to rely on the contract containing the arbitration provision, the contract must form the legal basis of those claims; it is not enough that the contract is factually significant to the plaintiff's claims or has a 'but-for' relationship with them." *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 449 F. App'x 704, 709 (10th Cir. 2011). HSN has only shown that the account agreement has a but-for relationship with Jewell's claims, and it hasn't shown that Utah's Supreme Court would be likely to estop Jewell from avoiding arbitration. *See also CollegeAmerica Servs., Inc. v. W. Benefit Sols., LLC*, No. 11CV01208, 2012 WL 1559745, at *2–3 (D. Utah May 2, 2012) (concluding under Utah law that nonsignatory defendant couldn't estop signatory plaintiff from avoiding arbitration because plaintiff's claims weren't based on contract containing agreement to arbitrate).

HSN cites numerous cases in which, it says, federal courts outside Utah have allowed nonsignatories to compel arbitration against signatories, but none of them show that equitable estoppel is applicable here. Several of them involve claims based on the contracts including the arbitration agreements being enforced. *See, e.g., Hughes Masonry Co. v. Greater Clark Cty. Sch. Bldg. Corp.*, 659 F.2d 836, 838 (7th Cir. 1981). As discussed above, Jewell's claims aren't based on the account agreement. Other cases involve dissimilar facts or different legal questions. *See, e.g., Holland Am. Line Inc. v. Wartsila N. Am., Inc.*, 485 F.3d 450, 455–56 (9th Cir. 2007) (enforcing a forum selection clause, not an arbitration clause, on grounds other than estoppel); *Tickanen v. Harris & Harris, Ltd.*, 461 F. Supp. 2d 863, 869–70 (E.D. Wis. 2006) (estopping

signatory plaintiff whose debt had been transferred by signatory creditor to nonsignatory defendant).

In short, HSN has cited no authority for its view that Jewell should be estopped from avoiding arbitration under the circumstances of this case. Because Jewell's claims are based on the TCPA and the WCA, not the account agreement, HSN can't rely on equitable estoppel to compel arbitration.

CONCLUSION

HSN isn't an affiliate of Comenity within the meaning of the agreement's arbitration provision, nor is it otherwise a third-party beneficiary of the account agreement, so it lacks the right to compel arbitration under the provision's terms. And Jewell's claims against HSN aren't based on his agreement with Comenity, so he isn't estopped from avoiding arbitration under the agreement. The court will deny HSN's motion to compel arbitration.

ORDER

IT IS ORDERED that defendant HSN, Inc.'s motion to compel arbitration, Dkt. 11, is DENIED.

Entered November 7, 2019.

BY THE COURT:

/s/
_____
JAMES D. PETERSON
District Judge